IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | |
|---|---|
| GULF RESTORATION NETWORK ) | |
| ) | |
| Plaintiff, ) | |
| ) | CASE NO. 1:17cv130-LG-RHW |
| v. ) | |
| ) | Judge Louis Guirola, Jr. |
| OSCAR RENDA CONTRACTING, INC. ) | |
| ) | Magistrate Judge Robert H. Walker |
| Defendant. ) | |
| ) | |

**MEMORANDUM IN SUPPORT OF RESPONSE IN OPPOSITION TO
OSCAR RENDA CONTRACTING'S MOTION *IN LIMINE* TO EXCLUDE
TESTIMONY OF DR. KEVIN S. DILLON**

The Gulf Restoration Network ("GRN") respectfully submits that the Court should deny the motion *in limine* of Defendant, Oscar Renda Contracting, Inc. ("ORC"), to exclude the testimony of Dr. Kevin S. Dillon. The motion should be denied for the following reasons:

(1)  ORC's attack on Dr. Dillon's testimony is based on the assertion that sediment deposits from storm water can only be the subject of testimony by a geologist. This assertion is at odds with both the facts of the case and the law on expert testimony. Dr. Dillon's qualifications to testify regarding the characteristics and effects of polluted runoff of the kind that ORC caused in this case are well established and well within his areas of research and competence.

(2)  ORC's claims that Dr. Dillon does not provide any data to support his conclusions are baffling, given that his report cites the basic facts concerning the massive construction project at issue here, his own research in low-energy systems like Biloxi Bay, and 24 separate research publications on sediment and storm water issues. If ORC believes that any of the data

1

cited is inapplicable or unreliable, the company can certainly bring that out through vigorous cross-examination.

Further, if the Court finds that there is any question as to ORC's motion, the GRN suggests that the proper course of action at this point would be a *Daubert*[1] hearing at which both Dr. Dillon and the geologist that ORC relies upon could be questioned on the record.

In sum, Dr. Dillon's testimony clearly possesses the requisite indicia of relevance and reliability to qualify as admissible. Any disputes concerning the basis for his conclusions go to weight and not admissibility. For these reasons, and as discussed further below, this court should deny ORC's motion *in limine*.

## I.    FACTUAL BACKGROUND

This is a case for violations of the Clean Water Act stemming from ORCs failure to implement controls to prevent sediment runoff to Biloxi Bay and the bayous leading to the bay. Beginning in 2014, Oscar Renda Contracting tore up about 50 miles of hard surfaced urban streets in East Biloxi, north of the railroad tracks, in connection with the East Biloxi Road repair project.  The figure below shows the area of the project:

---

[1]*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).



On a big project like that one, the federal Clean Water Act expressly requires substantial controls on polluted runoff, many of which are implemented through a Storm Water Permit. This permit has a lot of protective requirements, some key ones here being perimeter controls like sediment fencing, filtering at storm drain inlets, periodic inspections, and correcting any deficiencies within 24 hours of discovery.

The Gulf Restoration Network is prepared to show at trial that Oscar Renda ignored many of these requirements over a multi-year period. The result was that untreated storm water laden with sediment went straight into the bayous leading to Biloxi Bay and the bay itself.

The science is frankly unimpeachable that this kind of pollution has multiple adverse effects on the receiving waterbody. Indeed, this science was the basis of the strict requirement under the Clean Water Act and its implementing regulations that companies like ORC maintain specific storm water controls. *E.g.,* 74 Fed. Reg. 62995 (Dec. 1, 2009) (Effluent Guidelines and Standards for the Construction and Development Point Source Category). Proof of the pollutants in and harmful effects of improperly managed storm water runoff is not necessary to proving violations of the Clean Water Act; that showing is made by showing that the required controls

were not implemented. Basically, that decision has already been made by Congress and the Environmental Protection Agency.

However, the potential for harm to public resources is one of the factors that the Court considers in determining the appropriate penalty under the Clean Water Act. Consistent with Fed. R. Civ. P. 26, the GRN disclosed its intent to use Dr. Kevin Dillon as an expert in explaining and applying the literature and his observations regarding this project and the impacts of ORC's violations. Dr. Dillon holds both a master's of science and PhD in oceanography and has taught in the University of Southern Mississippi's Department of Coastal Sciences since 2005. (CM/ECF Doc. No. 30-2 at 8). The GRN timely produced an expert report by Dr. Dillon summarizing his proposed testimony.

As the Court can see from a review of the report, Dr. Dillon provided factual, scientific information, supported by numerous cited articles, concerning the nature of sediment runoff, sediment-particle transport, and sediment deposition from construction sites, with particular emphasis on sediment deposition in coastal estuaries. (*Id.* at 1-2). Likewise, he provided general scientific information concerning the environmental impact construction sites can have on water quality, marine habitat, and aquatic communities—again with an emphasis on coastal estuaries. (*Id.* at 2-5).

Dr. Dillon premised the opinions and conclusions in his report on ORC's "documented lack of safeguards to trap sediments in eastern Biloxi during extended time periods while there were large amounts of disturbed soil" associated with the project at issue ("the Project") (*id.* at 1), and his observations that ORC's failures have impacted Biloxi's bayous (Dillon Declaration ("Exhibit 1"), ¶¶ 15-18, 20). He applied his knowledge of the geographic extent of ORC's Project to estimate "the maximum area disturbed" as, conservatively, "in excess of 150

4

acres." (CM/ECF Doc. No. 30-2 at 1). He further opined that the Project "has likely resulted in a large increase in sediment runoff from eastern Biloxi to Biloxi Bay and its associated bayous and tributaries," and concluded, based on the data in the cited research studies, that "it is likely that the amount of delivered sediment is in the tens of millions of pounds." (*Id.* at 1). He noted, specifically, "in situations like that in the bayous receiving sediment flows from the construction project in Biloxi, repeated [sediment] burial may not give [marine] organisms a chance to recover." (*Id.* at 3).

While Dr. Dillon acknowledged the lack of sediment-transport studies specific to Biloxi's bayous and Back Bay, he compared studies from two other locations—Santa Monica Bay, in California, and Bangs Lake, along the Mississippi Gulf Coast. Having personally participated in the Bangs Lake study, Dr. Dillon offered his professional opinion that the Bangs Lake site "is similar to Biloxi Back Bay as both are shallow, low energy microtidal environments." (*Id.* at 2). He extrapolated from the data and methodology in the Bangs Lake study to estimate a 2-kilometer (1.2-mile) sediment-transport distance associated with the Project, then opined based on the size of Biloxi's Back Bay that the "zone of impact is the entirety of Back Bay from north of Keesler Air Force Base well into Biloxi Bay." (*Id.*).

Dr. Dillon used one photograph taken of the unnamed bayou as an example to illustrate the problem of estuarine sediment-deposition associated with the Project, applying his professional knowledge and making the visual observation that "obvious" coarse materials depicted in the bayou in the photograph, "such as rock," were inconsistent with "the natural bottom composition of bayous in this area." (*Id.* at 3-4).

5

## II. APPLICABLE LAW

District courts possess "wide latitude in determining the admissibility of expert testimony." *Wilson v. Woods*, 163 F.3d 935, 936-37 (5th Cir. 1999) (quotation marks omitted). "Expert testimony is presumed admissible." *Martinez v. Porta*, 598 F. Supp. 2d 807, 812 (N.D. Tex. 2009); *see also United States v. Posado*, 57 F.3d 428, 435 (5th Cir. 1995) (referencing "the presumption in favor of admissibility established by Rules 401 and 402"); Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendments ("[T]he rejection of expert testimony is the exception rather than the rule.").

The Federal Rules of Evidence allow "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" to offer testimony "in the form of an opinion or otherwise" if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The factors outlined above are designed to test two features of scientific testimony—(1) relevance, and (2) reliability. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594-95 (1993).

A non-exclusive list of factors outlined by the Supreme Court typically forms the starting point for assessing reliability:

(1) "whether a theory or technique . . . can be (and has been) tested;

(2) "whether the theory or technique has been subjected to peer review and publication";

  (3)  "the known or potential rate of error" in the application of a particular technique;

  (4)  "the existence and maintenance of standards controlling the technique's operation"; and

  (5)  the technique's "'degree of acceptance'" in the "'relevant scientific community.'"

*Id.* at 593-95 (citation omitted).

  As this Court has often noted, "[e]xpert testimony is relevant when it relates to any issue in the case." *Gibson v. SmithKline Beecham Corp.*, No. 1:14CV319-LG-RHW, 2016 WL 1069090, at *2 (S.D. Miss. Mar. 17, 2016). In addition, the *Daubert* factors are a starting point, and the Court must consider whether other factors are also appropriate. The test is whether the expert employs in the courtroom the same rigor that an expert in the relevant field would apply. *Id.* (citing *Hathaway v. Bazani*, 507 F.3d 312, 318 (5th Cir. 2007).

  Reliability analysis "must be solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595. As ORC concedes, the test for reliability is "a flexible one." *Id.* at 594; (*and see* CM/ECF Doc. No. 31 at 4). While "subjective belief or unsupported speculation" does not qualify under Rule 702, *Daubert*, 509 U.S. at 599 (quotation marks omitted), inferences drawn from "'anybody of known facts'" are allowed, along with "'anybody of ideas . . . accepted as truths on good grounds,'" *id.* at 590 (quoting Webster's Third New International Dictionary 1252 (1986)). Experts often used their specialized backgrounds to "'tie observations to conclusions.'" *Costly v. Nissan Motor Co., Ltd.*, No. 14-244-SDD-EWD, 2016 WL 8252924, at *4 (M.D. La. Aug. 31, 2016) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148 (1999)). An expert's testimony can be based "mainly on his personal observations, professional experience, education and training." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 247 (5th Cir. 2002).

While Dr. Dillon's testimony is anything but shaky, numerous courts including the Fifth Circuit have noted that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546 (5th Cir. 2004) (quotation marks omitted).

### III.   THE MOTION IN LIMINE SHOULD BE DENIED

Dr. Dillon relied on the factual information discussed in his report and inferences derived from the scientific data in the cited reports to support the following overall conclusions:

(1) "The sediment flows from the construction project in East Biloxi to Biloxi Bay were substantial and conservatively in the tens of millions of pounds";

(2) "The area affected by this sediment flow is conservatively the entire middle section of the bay";

(3) "Sediment inputs have substantial and far reaching impacts on marine species and habitats. The duration of these impacts is variable, but are clearly extended by repeated sedimentation events"; and

(4) "In the case of the unnamed bayou depicted in the photos, there are large sediment deposits directly adjacent to the storm water outfall, that are clearly not natural deposits."

(CM/ECF Doc. No. 30-2 at 5).

ORC's motion *in limine* basically consists of three claims: (1) that Dr. Dillon's testimony is not supported by data and thus is not reliable (CM/ECF Doc. No. 31 at 1-3, 9-12), (2) that conclusion number three is not relevant (*id.* at 11-12), and (3) that conclusion number four is inadmissible because Dr. Dillon is not a registered geologist (*id.* at 1, 3, 6-8, 11, 12-14).

While ORC attempts to frame its dispute in terms of the Supreme Court's *Daubert* factors (*id.* at 9), we note at the outset that ORC offers no challenge to any of the techniques, principles, or methodologies used in the cited articles and applied by Dr. Dillon. Instead, ORC makes the

general claim that Dr. Dillon's report is so conclusory, speculative, and filled with unsupported extrapolation that ORC is unable to understand and test its underlying scientific basis. (*Id.* at 9-13). Importantly, ORC does **not** challenge Dr. Dillon's qualifications to testify as an expert on the characteristics of storm water runoff.  In addition, we note that ORC has not sought any explanation of any part of Dr. Dillon's conclusions or bases it considers unclear, such as by taking his deposition.  Rather, the company simply ignores the bulk of his report and asserts that the Court should exclude the testimony.

A.     **Dr. Dillon's Testimony Is Reliable and His Conclusions Are Supported by Unchallenged Research Studies and the Data in Those Studies.**

ORC mistakenly claims that Dr. Dillon's report contains "simply insufficient facts or data . . . to comport with the requirements of *Daubert* and F.R.C.P. 26," and "there is no way for [his] opinions to be tested" under *Daubert* "because he has not identified any underlying data or method for his conclusions." (*Id.* at 9).  In so doing, ORC takes particular issue with Dr. Dillon's conclusions that (1) sediment flows from the Project "were substantial and conservatively in the tens of millions of pounds" (*id.* at 10), and (2) "[t]he area affected by this sediment flow is conservatively the entire middle section of the bay" (*id.* at 10-11). ORC characterizes Dr. Dillon's report as *ipse dixit* based solely on "credentials and his subjective opinions." (*Id.* at 9). On the contrary, Dr. Dillon's testimony is well founded on the unchallenged data, principles, and methodologies contained in 24 cited articles—including one involving his own original research along the Gulf Coast of Mississippi (the same region at issue), and another study specific to the Northern Gulf of Mexico—along with his professional knowledge and experience. (CM/ECF Doc. No. 30-2 at 5-15).

1.     **ORC Ignores the Studies and Data Cited in Dr. Dillon's Report.**

ORC makes the baffling claim that "[t]here is **literally no data** of **any kind** referenced in **any portion** of Dr. Dillon's report." (CM/ECF Doc. No. 31 at 3 (emphasis added)). ORC subsequently admits that Dr. Dillon referenced "scientific literature of studies at other locations," but takes issue with the fact that he referenced only one document specific to this case—"a single photograph taken by someone else." (*Id.* at 3). ORC incorrectly implies that the totality of Dr. Dillon's report is based on this single photograph, which "a true expert would not rely on." (*Id.*). ORC further attacks Dr. Dillon's report under Fed. R. Civ. P. 26 as listing opinions without providing "the basis and reasons for his conclusions," and opining as to conclusions that are "likely" or events which "can" occur. (*Id.* at 1-2, 10).

To the contrary, Dr. Dillon's report clearly states the bases of the conclusions drawn, and the fact that these things are likely to occur as a result of ORC's violations of the Clean Water Act is clearly relevant to penalties. As he states in his declaration, scientists in his field use reliable, peer reviewed studies to understand the effects of actions like discharging polluted storm water. (Exhibit 1, ¶ 24). As ORC has failed to challenge any of the data and methodologies in those studies, this court should accept their reliability and treat any contrary argument as waived. *See Dugger v. Stephen F. Austin State Univ.*, 232 F. Supp. 3d 938, 957 (E.D. Tex. 2017) (viewing arguments not raised in an initial brief as waived); *Johnson v. Watkins*, 803 F. Supp. 2d 561, 575 n.3 (S.D. Miss. 2011) (declining to consider an argument raise for the first time in a reply brief).

Dr. Dillon properly derived the totality of his conclusions from this large "body of known facts," relying further on his "personal observations, professional experience, education and training." *Daubert*, 509 U.S. at 590 (quotation marks omitted); *Pipitone*, 288 F.3d at 247. In

particular, the unchallenged research studies illustrate the reliability of his conclusions as to (1) the "tens of millions of pounds" of delivered sediment (CM/ECF Doc. No. 30-2 at 1, 5), and (2) the 2-kilometer sediment-transport distance (*id.* at 1-2, 5). Moreover, his professional background as an oceanographer and researcher allowed him to "tie observations to conclusions" concerning (3) manmade alterations to the natural bottom composition of the unnamed bayou. *Costly*, 2016 WL 8252924, at *4 (quotation marks omitted).

### 2. Unchallenged Data and Techniques Support Dr. Dillon's Conservative Estimate as to the Amount of Sediment Delivered from the Project.

Dr. Dillon's use and application of the cited research studies is evident from his report, as further supported by the declaration attached as an exhibit to this response. First, in concluding that the amount of delivered sediment conservatively reached the "tens of millions of pounds," Dr. Dillon relied on his observations concerning the lack of storm water controls and large area of disturbed soil, the runoff figures in the Wolman and Schick study, and EPA's review of 60 studies specific to construction sites. (CM/ECF Doc. No. 30-2 at 1; Exhibit 1, ¶ 23).

Simple mathematics shows that the cited studies back Dr. Dillon's conclusions. As Dr. Dillon's report specifically states, the summary of 60 studies by the Environmental Protection Agency concludes that sediment yields from catchment basins containing construction activities can release up to 219 tons or 438,000 pounds per acre per year. (CM/ECF Doc. No. 30-2 at 1). As Dr. Dillon further stated, a conservative estimate of the maximum area disturbed in the project at issue is 150 acres. Over a single year, with inadequate sediment controls, the amount of sediment released could reach 438,000 X 150 or 65,700,000 pounds. Thus, over the multi-year project period, and even assuming that there were some sediment controls in place, tens of millions of pounds is a conservative figure.

11

As Dr. Dillon states in his declaration, we do not know the *exact* amount of sediments without further studies, but that is not necessary to understanding the likelihood of harmful effects. (Exhibit 1, ¶ 22). Indeed, as noted above, that is the very reason that we have controls on storm water discharges.

Again, Oscar Renda may disagree with the figures, and can certainly seek to undercut them through cross-examination or other evidence, but the basis for the conclusion is clearly stated and well supported.

### 3. Unchallenged Data and Techniques Support Dr. Dillon's Conclusion Regarding Sediment-Transport Distance.

Next, in projecting the extent of sediment transport, Dr. Dillon properly considered 8 unchallenged studies documenting sediment impacts ranging from 2-to-4 kilometers (1.2-to-2.5 miles), to "several miles downstream" and "as far as 56 miles downstream." (*Id.* at 1-2). He applied a figure at the low end of these calculations based on his independent research at Bangs Lake (showing transport of at least 2 kilometers or 1.2 miles), and his knowledge of its similarity to Biloxi's Back Bay. (*Id.* at 2; Exhibit 1 at 24). Thus, 2 kilometers (1.2 miles) is a reasonable and conservative estimate supported by data. As it is undisputed that Biloxi's Back Bay is 1-to-2 kilometers wide (CM/ECF Doc. No. 30-2 at 2), Dr. Dillon's related conclusion that the affected area "is conservatively the entire middle section of the bay" (*id.* at 5) readily passes muster under the reliability test.

While ORC argues that the Bangs Lake study is not analogous because it involved gypsum (CM/ECF Doc. No. 31 at 11), such a claim goes to weight and not admissibility. *See United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cty., State of Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility

12

and should be left for the jury's consideration." (quotation marks omitted)); *Martinez*, 598 F. Supp. 2d at 812-13 (stating that the facts relied on by opposing experts to reach contradictory conclusions "are ripe subjects for cross-examination and show that these experts' opinions contain the indicia of reliability envisioned by *Daubert* and its progeny"). Once again, ORC is free to cross-examine Dr. Dillon if it wishes, but to date it has chosen not to do so.

**B.      Dr. Dillon's Proposed Testimony Is Clearly Relevant.**

ORC does not challenge the relevance of the majority of Dr. Dillon's report. Indeed, it is beyond dispute that testimony concerning the nature of sediment transport and deposition from construction sites, especially the Project at issue, to receiving waterbodies, especially Biloxi Bay and its connected bayous, would assist the trier of fact with respect to penalties in this case.

With regard to his environmental-impact testimony, Dr. Dillon relied on 14 unchallenged studies and his decade of professional knowledge of bayous like "the bayous receiving sediment flows from the construction project in Biloxi" to offer factually accurate testimony of a scientific nature concerning the effects of elevated sediment and turbidity levels, such as those associated with storm water pollution from construction sites, on estuarine ecosystems. (CM/ECF Doc. No. 30-2 at 2-5). He observed that "repeated [sediment] burial may not give [marine] organisms a chance to recover." (*Id.* at 3). Accordingly, he reached the challenged factual conclusion that "[s]ediment inputs have substantial and far reaching impacts on marine species and habitats. The duration of these impacts is variable, but is clearly extended by repeated sedimentation events." (*Id.* at 5). Such information "can be properly applied to the facts in issue," especially the amount of civil penalties to be awarded for violations under the Clean Water Act. *Johnson*, 685 F.3d at 459 (quotation marks omitted).

The Act mandates consideration of factors including "the seriousness of the violation or violations . . . the degree of culpability involved . . . and any other matters as justice may require." 33 U.S.C. § 1321(b)(8). Thus, if the GRN proves that ORC violated the Act through improper discharges resulting in "repeated sedimentation events" (CM/ECF Doc. No. 30-2 at 5), then Dr. Dillon's testimony would make it "more probable" that ORC's actions caused actual harm to the environment, Fed. R. Evid. 401. In such case, it would be appropriate under 33 U.S.C. § 1321(b)(8) for this Court to treat ORC's actions as more serious with an increased degree of culpability, such that the interests of justice weigh in favor of greater penalties. This is a factor that goes to the Court, rather than the jury, and the Court is fully capable of weighing the reliability of Dr. Dillon's testimony and giving it appropriate weight.

**4.    Dr. Dillon's Testimony Based on a Photo of Sediment Deposits is Clearly Within His Area of Expertise.**

Dr. Dillon's qualifications include assessing impacts of storm water, sediment sampling, movement of discharges through a water body, and coastal ecosystems. (Exhibit 1, ¶¶ 11-14). ORC does not appear to be aware of Dr. Dillon's publications, which were part of his resume. Instead, ORC attempts to prevent Dr. Dillon from testifying to a single conclusion in his report based on the convoluted premise that such testimony of necessity must come from a geologist. (CM/ECF Doc. No. 31 at 1, 3, 6-8, 11, 12-14). The testimony in question concerns "the unnamed bayou depicted in the photos," and Dr. Dillon's opinion that "there are large sediment deposits directly adjacent to the storm water outfall, that are clearly not natural deposits." (CM/ECF Doc. No. 30-2 at 5).

Dr. Dillon's long list of publications includes many that are directly relevant to assessing the impacts of polluted runoff. (Exhibit 1, ¶ 14). Regardless of how you characterize his expertise, he clearly is qualified by experience and education to testify on these issues.

"Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss*, 573 F.3d at 452. Once again, ORC's complaints are properly the subject of cross-examination, not a motion *in limine*. *Id.* at 452; *Martinez*, 598 F. Supp. 2d at 812-13.

In the end, ORC has not really attempted to challenge Dr. Dillon's qualifications, instead simply asserting that any testimony about sediment deposition must come from a geologist. This is simply incorrect. Again, the Court's own experience will show that some areas of testimony may be within the expertise of several kinds of experts.

As an example, courts have allowed neurologists to offer opinions related to mental health, even though such doctors do not hold licenses as psychologists or psychiatrists. *See Carlton v. H. C. Price Co.*, 640 F.2d 573, 581 (5th Cir. 1981) (upholding a trial court's determination that a neurologist was competent to testify as to the plaintiff's need for various types of psychological services); *Matthews v. Kroger Texas, LP*, No. 4:13-CV-090-Y, 2015 WL 11022774, at *1 (N.D. Tex. Aug. 21, 2015) (unpublished) (applying *Carlton* and concluding that a neurologist was "sufficiently qualified to testify in the field of neurology **and related fields**," including to offer an opinion related to mental health (emphasis added)).

In short, Dr. Dillon clearly has the proper qualifications to combine his knowledge of estuaries and storm water runoff, in general, and the bayous of the Gulf Coast of Mississippi, in particular, along with his firsthand observations of ORC's construction project, and offer an opinion concerning altered bottom composition.

## IV. CONCLUSION

The essence of ORC's motion *in limine* is a battle-of-the-experts critique appropriately resolved by the jury at the merits stage, or this Court at the penalty phase, rather than a pretrial motion.

ORC's generalized challenge to the basis for Dr. Dillon's testimony ignores the 24 studies cited in Dr. Dillon's report as the foundation for his conclusions. *Cf. Daubert*, 509 U.S. at 593-95. Instead, with regard to relevance, ORC surficially purports to challenge the science behind Dr. Dillon's environmental-impact testimony while failing to articulate a single supporting reason that would suggest inaccuracy. Likewise, ORC's reliability argument improperly rests on the conclusions themselves rather than principles and methodology. *Id.* at 595. Finally, ORC does not dispute Dr. Dillon's qualifications to evaluate the probable effects and movement of polluted runoff, but rather makes a semantic argument that ignores his specialized knowledge of estuaries.

Dr. Dillon's testimony is supported by data and more than satisfies the threshold standard for admissibility based on relevance and reliability. Accordingly, this court should deny ORC's motion *in limine*. However, should the Court determine that there is any real question here, the appropriate step would be a *Daubert* hearing, with both Dr. Dillon and Dr. Connor subject to cross-examination.

Dated this 2nd day of February, 2018.

Respectfully submitted,

WALTZER WIYGUL & GARSIDE LLC

*/s/ Robert B. Wiygul*
Robert B. Wiygul, MS Bar #7348
1011 Iberville Dr.
Ocean Springs, MS 39564
Tel: (228) 872-1125
Fax: (228) 872-1128
robert@wwglaw.com

*/s/ Elizabeth A. Fisher*
Elizabeth A. Fisher, MS Bar #105458
Attorney at Law
2816 Eagle Pine Dr.
Ocean Springs, MS 39564
Tel: (919) 909-9980
efisher.attorney@gmail.com

## **CERTIFICATE OF SERVICE**

I, Robert B. Wiygul, certify that I have served a copy of this pleading to all counsel through their registered ECF email address this 2nd day of February, 2018, as follows:

Todd Crawford:  TCrawford@frfirm.com

*/s/ Robert B. Wiygul*