**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**GULF RESTORATION NETWORK**                                      **PLAINTIFF**

**V.**                                              **CIVIL NO.: 1:17cv130LG-RHW**

**OSCAR RENDA CONTRACTING, INC.**                        **DEFENDANT**

---

**REBUTTAL MEMORANDUM IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

## I.    INTRODUCTION

In its motion and supporting evidence the GRN identified and supported 128 specific instances of noncompliance, divided into 23 location-based time series and amounting to over 900 total violations of claims in the complaint. GRN's Exhibit 1 (Doc. 101-1) walked through each instance with pinpoint citations connecting the visual files to witness testimony, the applicable portions of the Storm Water Permit, SWPPPs, and Construction Drawings, and the corresponding rainfall data. The GRN fully supported its *prima facie* case, shifting the burden to Oscar Renda.

Rather than addressing GRN's evidence, Oscar Renda asserts that "[s]pace limitations prevent [it] from discussing all of the voluminous attachments to GRN's motion . . ."[1] Yet rebutting GRN's claims with particularity is precisely Oscar Renda's burden at this point.[2]

---

[1] Doc. 124, pp. 24-25. The company did include the declaration of John Cowart, discussed infra, and a separate exhibit which purported to rebut the GRN's statement of uncontested material facts, but provides almost no citation to evidence.
[2] *See Jackson v. Cal–W. Packaging Corp.*, 602 F.3d 374, 379–80 (5th Cir.2010) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."); *IberiaBank v. Previty Surgical PLLC*, 2017 WL 3393952, at *3

1

Oscar Renda also treats its response as a new motion for summary judgment on the whole complaint. To the extent Oscar Renda seeks "summary dismissal" of entire claims based on arguments not raised in its own inadequate "no evidence" motion, it may not have a second bite of the apple now that the dispositive motions deadline has passed.[3]

Oscar Renda's nonresponsive response is patently insufficient to rebut GRN's *prima facie* case for the following reasons.

First, Oscar Renda's assertion that the GRN's case has to be dismissed based on an administrative order by the Mississippi DEQ is contrary to the plain language of the Clean Water Act.  33 U.S.C. § 1365(b)(1)(B), which  the commencement of a "civil or criminal action in a court of the United States, or a State."

Second, the claim that expert evidence is required for basic factual observations like the absence of silt fencing is contrary to the permitting documents, Mississippi water quality law, and the relevant case law.  Oscar Renda itself relies on exactly the same kind of testimony from its employee John Cowart, who is not an expert.

Third, as set out in the response to Oscar Renda's Motion to Strike the declaration of Elizabeth Englebretson, all of the images have ample evidence that they are what they purport to be.  Oscar Renda witness Cowart even identifies and describes what is shown in the challenged photos, which further authenticates them.

Finally, the testimony of John Cowart either directly acknowledges or does not contest the underlying factual basis of the majority of the violations at issue in this motion.

---

(S.D. Tex. Aug. 4, 2017) (criticizing a response that "did not substantially engage with the plaintiff's motion").

[3] *Louviere v. W&T Offshore, Inc.*, No. 6:16-cv-00724, 2018 WL 1476242, at *4 (W.D. La. March 26, 2018); *see also Street v. Corr. Corp. of Am.*, 102 F.3d 810, 816 (6th Cir. 1996) (finding "no authority" for the proposition that "failure to move for summary judgment" on an argument "amounts to a waiver" of that argument).

1.      Oscar Renda's claim that MDEQ actions preempt this suit is contrary to the plain
        language of the Clean Water Act.

It is surprising that Oscar Renda asserts that 33 U.S.C. § 1365(b)(1) bars this suit.[4]  The

company never cites the statutory language, which provides that a citizen suit may not be

commenced "if the Administrator or State has commenced and is diligently prosecuting a civil or

criminal action in a court of the United States, or a State to require compliance with the standard,

limitation, or order . . . ."  The MDEQ administrative orders cited by Oscar Renda are

administrative orders, not actions in a "court of the United States, or a State . . . ."

Oscar Renda's real purpose in citing these orders seems to be to imply to the Court that

the Mississippi DEQ found nothing wrong with Oscar Renda's storm water controls, and the

Court should do the same.  The fact is that the MDEQ orders addressed a different time frame

than the majority of the Clean Water Act violations at issue here, and involved different

violations.

MDEQ's first notice of violation was in April 2017, well after the GRN's notice letter

and the violations noticed in that letter. Notably, Oscar Renda employee Jennifer Matranga

stated to MDEQ that the company had made "100% improvement" in storm water management

"in recent weeks."[5]  The Notice of Violation Letter from MDEQ does not specify the failure to

implement, and the inspection report notes only "SWPPP not being indicative of the findings

throughout the project site," and the failure to include new lay down yards.[6]  Oscar Renda

apparently told MDEQ there were only 16 outfalls draining from the project, which did not

include some of the outfalls that the company here concedes drain the project.  The compliance

order was not lifted until December 2017, long after most of the violations in this suit.

---

[4] This is an affirmative defense that should have been raised by separate motion under the local rules.
[5] Doc. 123-2 at 5.
[6] *Id.* p. 2.

Oscar Renda also does not supply the Court with the MDEQ's September 27, 2017 memo on a site visit, which states that "[i]t appeared that efforts are being made in order to achieve compliance with the general requirements of Mississippi's Large Construction Storm Water General Permit."[7]  This is not a statement of full compliance, and in fact states a continuing lack of compliance.  Why MDEQ chose not to pursue other violations could be for many reasons, including that the agency never saw them.  Regardless, Congress made it clear that the agency's failure to pursue the violations does not preempt a citizen suit.

2.    <u>Oscar Renda's legal argument that there is only a single violation for failing to implement the SWPPPs is contrary to the terms of the Storm Water Permit and the SWPPPs.</u>

Oscar Renda's initial argument is basically that, as a matter of law, there is only a single cognizable violation of the Clean Water Act, the failure to implement the Storm Water Pollution Prevention Plans. The company misunderstands how the Storm Water Permit and the SWPPPs operate.

For example, the third claim in GRN's complaint is for the failure to implement adequate structural controls. Doc. 1, pp. 17-18.  Condition ACT 5, Nos. T-2, T-3, T-6, T-7 & T-8 T-6 require that specific structural practices such as silt fencing be used to limit runoff from exposed areas.[8]  As specifically cited in the GRN's complaint and briefing, these requirements are further developed and made mandatory in the relevant Pollution Prevention Plans for each area.  For example, Section 3.2 of the SWPPP for GRN 5 provides specifically that "silt fencing and a sediment barrier will be installed to intercept and retain sediment from disturbed areas during construction activities."[9]  There are further specific instructions about where these controls are to be installed.

---

[7] Exhibit 16.
[8] Doc. 101-5.
[9] Doc. 101-6, p. 55.

The violation is the failure to install these controls.  The permit requires a plan that includes these controls, and the plan requires that they be installed.  The permit also includes a separate provision that requires implementation of the controls in the SWPPP. The same is true for the GRN's eighth claim for relief was for violation of Conditions ACT12, Nos. T-1 and T-2, which state a separate requirement to comply with the permit, and to take reasonable steps to minimize or prevent any discharge in violation of this permit which is likely to adversely affect human health or the environment.  Likewise, the failure to maintain controls once installed is a violation of the specific terms of the SWPPPs, which implement the terms of the Storm Water Permit.  Note that the failure to implement structural controls and the failure to maintain those controls can be present in a single situation.

Clean Water Act permits frequently include multiple terms which are violated by a single action.  *E.g., Public Int. Res. Group of N.J. v. Powell Duffryn Terminals*, 913 F.2d 64 (3d Cir. 1990) (single exceedance of a parameter violated both seven day and thirty day average limitations).  Allowing violations of multiple provisions of the Storm Water Permit and the SWPPPs to be subsumed under a single "failure to implement" violation would have the practical effect of minimizing the incentive for companies like Oscar Renda to properly monitor compliance with all of the requirements of the SWPPP. *U.S. v. Smithfield Foods,* 191 F.3d 516, 528 (4th Cir. 1999) (counting each term as a violation preserves incentive to comply with all terms).

Ultimately, the Mississippi administrative authorities chose to have multiple requirements in both the Storm Water Permit and the Storm Water Pollution Prevention Plans.  The terms of the permit and those plans are enforceable.  If these provisions are ignored, they become surplusage.  To the extent that Oscar Renda believes that the terms are surplusage or redundant,

the place to fix that is in the administrative process, rather than through a collateral attack in this Court.

3. <u>Oscar Renda's argument that narrative water quality standards are just an aspect of implementation and require expert testimony is clearly wrong.</u>

Oscar Renda does concede that the narrative water quality standard violation prohibiting sediment forming objectionable deposits and causing color changes inconsistent with the receiving waters is a separate term of the permit, but suggests that the GRN construes ACT 7 as prohibiting all discharges of sediment. The company thus suggests that the standard is duplicative of the term requiring implementation of the permit and SWPPP terms, since "the natural and inevitable consequence of that is to allow some eroded soils to enter receiving waters . . . ."[10]

Oscar Renda is setting up a straw man since the GRN has never asserted that all discharges of sediment are prohibited.[11] The violations of narrative water quality standards in the GRN's motion are obvious to the observer, and involve marked changes in color of the receiving waters or obvious deposits of sediment directly at the outfalls.  Oscar Renda does not address the specific evidence at all.

As it has in various other venues, Oscar Renda also argues that fact witnesses cannot testify as to whether storm water runoff is inconsistent with the color of receiving waters.  This is another collateral attack on the fact that the permit, which has a narrative rather than numeric limitation.  Oscar Renda is basically attempting to graft some kind of numeric requirement that the Mississippi DEQ chose not to include.  As the GRN discussed in its response to Oscar

---

[10] Doc. 124 at 9.
[11] Condition ACT 5, No. T-3 of the Storm Water Permit does require that the SWPPP minimize sediment discharges from the site. Exhibit 5.

Renda's motion to strike the declaration of Elizabeth Englebretson, the courts have consistently allowed lay testimony on this specific issue, as well as similar issues.[12]

Oscar Renda also makes the inconsistent assertion that the GRN "does not address the receiving waters at all."[13] This is obviously incorrect.  Englebretson and Smith both address the ordinary color of the receiving waters.[14]  Dr. Dillon does the same thing.[15] There is ample evidence in this regard on the GRN's side, but not on Oscar Renda's.

Oscar Renda also seems argue that to make its prima facie case on narrative water quality standard violations the GRN must disprove that the inconsistent color might be the result of resuspension of sediment due to additional hydraulic energy after rainfall events.[16]  Dr. Connors provides a supplemental report, which he did not do during the discovery period, in which he discusses shaking up a jar to illustrate this point.[17]  Dr. Connors does not appear to have examined the photos or the testimony of Ms. Englebretson.  The photos and videos at issue show sediment filled water flowing directly into the bayous and Biloxi Bay from the project site and making a color change.  Even if hydraulic energy was re-suspending some sediment in the bayou – and Dr. Dillon's monitoring of similar bayous without any road work shows that at best it was minor[18] – the muddy water at issue was *flowing into the bayou from the construction site*.   For example:

---

[12] Doc. 131 pp. 12-14.
[13] Doc. 124 at 9.
[14] Docs. 101-2, 101-3.
[15] Doc. 103-1.
[16] Doc. 124 at 10.
[17] GRN asks that this Court decline to consider Dr. Connors's declaration, which is essentially an untimely supplemental expert report, for the reasons articulated in GRN's response to Oscar Renda's motion to strike Dr. Dillon's supplemental report. *See generally* Doc. 122.
[18] Doc. 103-1.



4.    <u>Oscar Renda submitted sworn inspection reports weekly, and even concedes in its response that it was aware of non-compliance.</u>

Oscar Renda concedes that MDEQ never received any written notice of non-compliance, but argues that to prove this violation the GRN must show when the company had actual knowledge of specific instances of non-compliance [19]

Oscar Renda had actual knowledge of all of the violations at issue through the GRN's notice letter, disclosures, discovery responses, and supplemental discovery responses.[20] The precise timing of Oscar Renda's knowledge is irrelevant, as the reporting violations remain ongoing in light of the company's total and complete reporting failure. *See Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055, 1057 (5th Cir. 1991) (treating the "failure to obtain a permit" in violation of NPDES requirements as "a continuing violation of the Act").

Further, Oscar Renda was the contractor on the job and had people on the site every day. Oscar Renda submitted inspection reports for the entire site every week as required by Condition

---

[19] Oscar Renda complains in a footnote that the company did not have adequate notice that it violated Miss. Admin. Code R. 1.14 (28)(f). Rule 11 Miss. Admin. Code Pt. 6 is specifically cited in the Storm Water Permit itself as the basis for the reporting requirement. Exhibit 5, Storm Water Permits, p. 43 of 99.

[20] GRN served initial disclosures containing Docs. 1-1824 on June 30, 2017; response to first request for production of documents with additional visual files on Sept. 20, 2017; and supplemental responses on Oct. 17, 2017, March 16, 2018,  April 23, 2018, and June 25, 2018.

No. ACT 6, No. S-5 of the Storm Water General Permit.  An example of the attestation on these reports is shown below.

Based upon this inspection, which I or personnel under my direct supervision conducted, I certify that all erosion and sediment controls have been implemented and maintained, except for those deficiencies noted above, in accordance with the Storm Water Pollution Prevention Plan (SWPPP) and sound engineering practices as required by the above referenced permit. I further certify that the LCNOI and SWPPP information is up to date.

I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my inquiry of the person or persons responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fines and imprisonment for knowing violations.

Authorized Signature

Jennifer Matranga
Printed Name

Date   2/11/2017

Project Manager
Title

These reports are an admission by the company that it inspected the entire site weekly (if not more frequently), "in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted."  The specific attestation shown above is from the inspection report for Phase GRS 1 for the period February 6, 2017 through February 11, 2017.[21]  Location 9, the area with muddy water flowing directly into Keegan Bayou with no storm water controls of any kind, is in this phase.  Ms. Englebretson's testimony and photos and videos establish that the lack of controls continued through June of 2017.

Presumably Oscar Renda does not state that the inspection reports were falsely attested, so the company had plenty of notice.

The testimony of John Cowart even confirms that the company was aware of the non-compliance for a number of situations, including that specific one at Location 9.  With respect to the lack of controls at Location 9, Mr. Cowart's declaration clearly indicates the company was aware of the uncontrolled storm water entering the bayou at this location.[22] The same is true at location 12, where Mr. Cowart concedes that controls were required but apparently asserts that

---

[21] Exhibit 17, Example Inspection Reports, p.25.
[22] Cowart Declaration, Doc. 123-4, p. 6, ¶ 18.

the company removed them due to concerns about flooding, an anticipated non-compliance.[23]
Mr. Cowart confirms that the uncontrolled pumping depicted at locations 14 and 15 occurred and
the company was aware of it.[24]  Mr. Cowart concedes that the unpermitted dam at location 19
washed out on five separate occasions, and had no sediment controls on the bare dirt, but none of
these events were ever reported.[25]

5.   <u>Oscar Renda does not contest the factual basis of the majority of the violations in the
     GRN's motion for partial summary judgment.</u>

Oscar Renda does not contest the following factual aspects of the GRN's motion for
partial summary judgment:

- The factual predicate for standing.

- That there were ongoing violations of the Clean Water Act.

- That there were actual discharges on the dates established by the NOAA precipitation data.

- That storm water is itself a pollutant.

- The bayous at issue and Biloxi Bay are waters of the United States.

Oscar Renda fact witness John Cowart also concedes, or does not contest, the *material*
facts establishing the majority of the violations at issue in this motion.[26]

The locations and dates for which the Cowart testimony either  unequivocally concedes
that storm water controls were not in place, or fails to contest the lack of controls, are
summarized below.

---

[23] *Id.* p. 8, ¶ 24.
[24] *Id.* p. 9, ¶ 26.
[25] *Id.* p. 11-12, ¶ 33.
[26] Mr. Cowart reviewed GRN Exhibit 14, Doc. 101-14, the portable document format summary exhibit with photos from each location which the GRN provided as a convenience to the Court and parties.  Mr. Cowart apparently did not review Elizabeth Englebretson's testimony, or the actual digital photos and videos.

**Location 1 - Bayou Auguste adjacent to Back Bay Boulevard** – The GRN's evidence demonstrated that in this location (1) there was dirt was pushed directly in the bayou with no controls; (2) there were no storm water controls on the edge of the area disturbed from construction on multiple dates from 2016 through 2018, (3) there was a turbidity curtain that was out of position on multiple dates, and (4) there was water flowing from two storm drain outfalls with color inconsistent with receiving waters.[27]  Mr. Cowart contests whether the turbidity curtain was out of place.[28]  However, this is not material to liability since this was not counted as a separate violation. He does not contest that dirt was pushed directly in the bayou with no controls, that there were no controls between the edge of the disturbed area and the bayou on the dates indicated, or that the water color was inconsistent with the receiving waters.  He indicates a sheet pile cofferdam was built around one outfall, but this is not the outfall with the narrative water quality standard violations, so that fact is not material.

Thus, Mr. Cowart does not contest the full factual basis for any of the violations at this location.

**Location 2 - Bayou Auguste adjacent to the east side of the Lee Street Bridge** – The GRN's evidence demonstrated that there was storm water runoff from the construction area of the road and a materials yard.[29] Documents 157, 254, 507, 513, 613, 1234, and 1277 and the testimony establish that there were no controls in place for over a year.  Docs. 2598 and 2719 and the testimony establish that after storm water controls were installed, those controls were not maintained as required by the permit and SWPPPs.  Docs. 2598, 2719, and 2969 and the testimony also demonstrate that there were discharges with heavy sediment and color inconsistent with the receiving waters. With respect to the Documents 157, 254, 507, 513, 613,

---

[27] Doc. 101-2, ¶ 24.
[28] Doc. 123-4, ¶ 5.
[29] Doc. 101-2, ¶ 25.

1234, and 1277 Mr. Cowart does not contest that there were no storm water controls in place. With respect to Documents 2598 and 2719, he states that these show "runoff has circumvented two separate rows of silt fencing . . ."[30] However, these videos and Ms. Englebretson's testimony show that there was a hole under the sediment fence which went unrepaired for almost a month.[31] In fact, the area was only maintained after counsel for the GRN pointed it out to Oscar Renda and requested that the company repair it. Mr. Cowart does not address the narrative water quality standard violations.

Thus, Mr. Cowart does not actually contest the material facts that establish the violations in this location.

**Location 3 - Bayou Auguste adjacent to the west side of the Lee Street bridge** – In this location the GRN's evidence also showed that there were no controls on runoff to the bayou from the area of construction. Docs. 256, 1232, 1277, 1352, 1355, and 1422 and the testimony show that there were no controls on the area draining to the bayou from February 7 to May 1, 2017.[32] Mr. Cowart states that in Docs. 256, 1232 and 1277 he believes the area had work being performed.[33] However, he does not state why this would be material since there are no controls protecting the bayou. He states that Doc. 1352 shows sediment fencing around a hole. However, the hole is not the basis of the violation. It is the area draining directly to the bayou. He states that in Doc. 1422 there is silt fence plainly visible.[34] However, this not material since the silt fence is on the other side of the bridge, in a separate area that also drains to the bayou.

Thus, in this location Mr. Cowart's testimony does not contest any of the material facts that establish the violations.

---

[30] Doc. 123-4, ¶ 8.
[31] Doc. 101-2, ¶ 25.
[32] *Id.* ¶ 26.
[33] Doc. 123-4, ¶ 9.
[34] *Id.* ¶ 11.

12

**Location 4 - Gilbert Mason Drive and Splendor Street** – In this area the GRN's evidence established that the sediment fencing in place repeatedly was undermined, with sediment moving offsite and burying marsh vegetation.[35]  Mr. Cowart concedes that the sediment fencing in this location either gets knocked down, or the water burrows a hole beneath it, and thus concedes the controls are ineffective.[36]  Mr. Cowart does not contest that this was never reported to the Mississippi DEQ.  He does not contest that the sediment has moved offsite.  He does testify that he believes that maintenance work was done.  Specifically, he states that comparing Doc. 1494 (May 3, 2017) to Doc. 1792 (June 21, 2017) shows that maintenance has been done because there are more rocks in the sediment overwhelming the fence.[37]  Mr. Cowart provides no evidence of when this maintenance was done.  He further testifies that Doc. 56 shows additional maintenance.  However, the violation stated for this date is that there was sediment piled on the other side of the sediment fence, contrary to the instruction of the SWPPPs.[38]  Mr. Cowart does not address the fact that Docs. 2470, 2483, 2585, 2593, and 2718 shows that there was a hole washed under the sediment fence on February 4, February 11, and March 6, 2018.  He therefore provides no evidence that this hole was ever repaired in this period.  Doc. 3008 shows pumping of muddy storm water without a filter bag directly to a hole under the sediment fencing.  Mr. Cowart does not address this violation at all.

Mr. Cowart's testimony in this location addresses only the question of maintenance during 2017, and the question when the maintenance took place is not material to the violations.

**Location 5 - North bank of Auguste Bayou, to the east side of the Braun Street bridge** – The GRN's evidence shows that this was an area which had bare dirt eroding into the bayou with no

---

[35] Doc. 101-2, ¶27.
[36] Doc. 123-4, ¶12.
[37] Doc. 123-4 at p.4, ¶12.
[38] Doc. 101-2, ¶28.

controls.[39]  Mr. Cowart does not contest the lack of controls.  He states instead that the outfall in this area was not connected to the storm drain system.[40]  However, the violation at this location was the lack of storm water controls between the disturbed area and the bayou.

Mr. Cowart's testimony on this area does not contest the material facts that form the basis of the actual violations.

**Location 6 - North bank of Bayou Auguste between Main Street and Braun Street –** In this location there were no storm water controls between the disturbed area of the construction site and the bayou.[41]  Mr. Cowart asserts that in each of the photographs "it is obvious" that the area has been grassed, seeded and become stabilized.  He further asserts that he can personally attest that the area has been stabilized and grassed.  He further asserts that all of the photos were taken at low tide, and that thus muddy bank is exposed.[42]  However, the issue is that there is bare, disturbed dirt without controls in the area around the outfall that has been constructed.   It is further obvious that this bare dirt is not just the area exposed by a low tide since it extends onto the bank and the area around the outfall.

Mr. Cowart's testimony does not establish an issue of material fact in this location.

**Location 7 - Storm drain inlet at Splendor and Gilbert Mason, draining to Bayou Auguste** – The GRN's evidence clearly shows that this storm drain inlet did not have controls, or had controls which allowed storm water to evade controls.[43]  Mr. Cowart testifies only that this inlet was not connected to the storm drain system at the time it lacked controls, and that it was "not yet connected to the newly installed outfall."[44]  However, as discussed in other pleadings, the

---

[39] *Id.*
[40] Doc. 123-4, ¶13.
[41] Doc. 101-2, ¶29.
[42] Doc. 123-4 p. 5, ¶ 14.
[43] Doc. 101-2, ¶30.
[44] Doc. 123-4, ¶15.

controls are required at all times, and this inlet shows that there is a good reason for this: the outlet will be connected and the silt that flows into the inlet will be discharged to Bayou Auguste. With respect to Doc. 1794, Mr. Cowart suggests that "someone other than Oscar Renda moved the drain inlet protection out of the way."[45] However, he provides no basis for this statement, and Oscar Renda employee Jesse Coker has testified that Oscar Renda moved controls in order to allow storm water to drain.[46]

Again, Oscar Renda does not contest the material facts of this violation, except with respect to why the controls were out of place in Doc. 1794. In that case his testimony is not based on personal knowledge, and therefore is not competent summary judgment evidence.

**Location 8 - Inlets on Main St. between Bradford & Carquote, draining to Auguste Bayou -** The GRN's evidence demonstrated two storm drain inlets draining to Bayou Auguste had no controls on multiple occasions.[47] Mr. Cowart concedes that the storm drain inlets pictured here drain to Bayou Auguste, and does not contest that they do not have controls. He contends that the amount of sediment contributed to the bayou is insignificant, but this is a matter for the penalty phase of the trial.[48]

Again, Oscar Renda does not contest the material facts demonstrating the violations at this location, and in fact concedes the violations.

**Location 9 - Keegan Bayou at the southeast corner of the intersection of Benachi Street and Division Street –** In this location Ms. Englebretson testifies, and the photos and

---

[45] The GRN objects to this as there is no basis of personal knowledge shown.
[46] Doc. 117-8, pp 59-60.
[47] Doc. 101-2, ¶31.
[48] Doc. 123-4 p. 6 ¶ 17.

videos confirm, that there were large flows of sediment laden storm water from the construction area, with no controls, or in some cases only partial controls in place.[49]

Oscar Renda does not contest the material facts establishing the violations in this location. Mr. Cowart concedes that storm water enters the bayou in this area "through a broken sheet pile wall." Mr. Cowart does not contest that on the dates shown and discussed in the evidence there were no storm water controls.[50] He testifies about an outfall that is actually related to Location 12 (see below).

**Location 10 - Inlet on East Side of Benachi, just north of Division draining into Keegan Bayou** – In this location the evidence shows a storm drain outfall which drains to Keegan Bayou. Docs. 75, 246, 339, 539, 730, 1017 and 1229 all either show this inlet with no controls or muddy water draining from the outfall into Keegan Bayou.[51] Mr. Cowart states the outlet is pre-existing, and that since the date of the images it has been removed, but that is not material to the lack of controls. He does not contest that there were no controls on this storm drain inlet as shown in Docs. 75, 246, and 339, or that it drained to Keegan Bayou at the time of the photos and videos. With respect to Docs. 1473 and 1474 he testifies that these documents do not indicate how long the condition existed.[52] But the documented violations continued for almost two months and the precise duration is immaterial to liability as it is undisputed that the conditions existed as of the dates documented. Mr. Cowart does not contest that the evidence shows that there were discharges of storm water with color inconsistent with the receiving waters.

---

[49] Doc. 101-2, ¶32.
[50] Doc. 123-4, ¶18.
[51] Doc. 101-2, ¶33.
[52] Doc. 123-4, ¶21.

Mr. Cowart does not contest the material facts which establish the violations in this location.

**Location 11 - Storm drain inlet on east side of Forrest Street, south of Division Street, draining to Keegan Bayou** – The GRN's evidence demonstrates that this storm drain inlet, which drains to the upper part of Keegan Bayou, had no controls prior to May 2017.  On May 4, 2017 there were rock bag wattles with gaps which allowed storm water to simply flow into the storm drain.[53]  Mr. Cowart does not contest the lack of controls prior to May 2017, or the discharge of storm water with color inconsistent with receiving waters.  He does assert that the receiving water has sediment from other sources, but this would be relevant only to penalties. With respect to Doc. 1495, he states that the photo does not show how long it was in that condition.  However, he provides no evidence that these controls were ever brought into compliance.

Again, Mr. Cowart does not establish any issue of material fact.

**Location 12 - Storm drain inlet on east side of Benachi, just south of Division, draining to Keegan Bayou** – The GRN's evidence demonstrates that this storm drain inlet had no controls for over a year, and that sediment-laden storm water was draining directly from this inlet through the outfall pipe into Keegan Bayou documented at Location 9, for example in Doc. 127.[54]  Mr. Cowart explicitly concedes that this inlet had no controls.[55]  Mr. Cowart testifies that the storm drain outfall shown discharging muddy water in Doc. 127 drains a concrete ditch, and that "one cannot assume that any dirty water flowing from this outfall stems from work performed by Oscar Renda."[56]  However, Mr. Cowart appears to be unfamiliar with the outfall.

---

[53] Doc. 101-2, ¶34.
[54] Doc. 101-2, ¶32.
[55] Doc. 123-4, ¶24.
[56] *Id.* ¶ 19.

The outfall is not connected to a concrete ditch, but to the storm drain line which includes this storm drain inlet.[57]

Mr. Cowart concedes that the storm drain inlet lacks controls, and does not contest the discharge of water inconsistent with the color of the receiving stream.

**Location 13 - Keegan Bayou at Iroquois Street adjacent to the bridge on either side** – The evidence shows that from August 2016 to March 2017 in this location there were disturbed areas directly adjacent to Keegan Bayou which did not have any storm water controls.  In June 2017 some sediment fence had been installed near the bayou in one area, but it was completely overrun by silty water flowing from the project area on Division Street.[58]  Mr. Cowart states that a storm drain outfall shown in Docs. 268 and 269 was newly installed.  However, this is not material since the lack of controls was on the disturbed area, and led to surface runoff.  With respect to Doc. 368, Mr. Cowart says the exposed dirt is the result of low tide.[59]  However, the violation is the uncontrolled bare dirt around the outfall above the tide line. With respect to Doc. 1812, Mr. Cowart states that sediment controls are in place, but he does not address the fact that they are being bypassed and are therefore inadequate.[60]

Mr. Cowart's testimony again does not state issues of fact that are material.

**Location 14 - Keegan Bayou at the Querens Avenue Bridge, south of Division Street** – In this location the evidence shows that there was drainage directly from the street to the bayou, and there is also a storm drain outfall that discharges to the bayou on the south side.[61] Mr. Cowart does not contest that the road drained to the bayou with no controls.  He further

---

[57] Doc. 101-7, p. 9 of 44 (construction drawing), Fourth Declaration of Elizabeth Englebretson, Exhibit 18.
[58] Doc. 101-2, ¶36.
[59] Doc. 123-4, ¶25.
[60] *Id.*
[61] Doc. 101-2, ¶37.

concedes that the pumping without controls depicted in Docs. 3022 and 3026 took place.[62]  He does not contest the narrative water quality standard violation.  Mr. Cowart refers to this part of the bayou as a concrete ditch, and says that it has sediment in it that is re-suspended whenever it rains.  However, that is not material to liability.

Mr. Cowart's testimony concedes several violations here, and is otherwise not directed to material facts on liability.

**Location 15 - Inlet on west side of Benachi, just north of Division -**  In this location Ms. Engelbretson observed and documented muddy water being pumped directly into a storm drain which was draining into the bayou.  The color was clearly inconsistent with the receiving waters.[63]  Mr. Cowart concedes that the photos and videos of this location "appear to suggest an Oscar Renda employee was pumping water into a storm drain inlet without a filter bag."[64]  This is exactly what Ms. Englebretson testified, also providing the employees name.[65]  Mr. Cowart does not contest this, nor does he contest that the muddy water was inconsistent with the color of the receiving waters.

There is no issue of material fact as to the violations at this site.

**Location 16 - Keegan Bayou west side of Benachi Street, south of Division Street** – The evidence in this site showed water draining through a material yard to Keegan Bayou, with no controls in place.[66]  Mr. Cowart concedes that there were no controls in place.  He asserts that the storm water drained through a heavily vegetated area, but Oscar Renda does not address the

---

[62] Mr. Cowart states that the work crew told him a filter bag had come loose, although he states clearly that he does not know if this is true.  Doc. 123-4 p. 9, ¶ 26.  This is hearsay which would not be admissible at trial.  The GRN therefore objects to the consideration of this part of Mr. Cowan's declaration. Fed. R. Civ. Pro. 56, Committee Notes on Rules – 2010 Amendment (no need to make a motion to strike to object that material cannot be presented in admissible form)
[63] Doc. 101-2, ¶38.
[64] Doc. 123-4 p. 10, ¶ 28.
[65] Doc. 101-2, p. 18, ¶ 38.
[66] *Id.* ¶ 39.

requirements of the Storm Water Permit or the applicable SWPPP, which provide for structural controls.[67]  Mr. Cowart does not contest the material facts.

**Location 17 – North of the corner of Benachi and Division on the east side of Benachi** – Docs. 340 728, 1014 and 1229 and the Englebretson testimony show this drain inlet with no controls on February 14, March 11, March 12, and March 25, 2017 respectively.[68]  Mr. Cowart acknowledges that this drain inlet was tied in and discharging on these dates.[69]  He does not contest the lack of controls on these dates.  He does not contest that Doc. 1807 shows that on June 21, 2017 the wattle on this drain was almost completely covered in sediment.  He provides no evidence of when the sediment was removed.  Mr. Cowart does state that Doc. 1836 from June 29, 2017 shows that some maintenance was done because there was a different wattle.[70]  Such minimal maintenance is immaterial where clearly inadequate, as he does not contest the large amounts of sediment laden water running into the drain, around and over the wattle but only suggests that someone other than Oscar Renda might have moved it away.[71]  With respect to Doc. 2383 on January 27, 2018, Mr. Cowart states that this was a dead box with no outlet at the time the photographs were taken.  But, as previously discussed, the controls are required at all times, making this issue immaterial.

Again, there is no issue of material fact raised.

**Location 18 - Keegan Bayou north of Percy between Bohn and Cuevas** – The evidence on this area showed that there are three more or less distinct places where the water drains to Keegan Bayou through a connected wetland area along the bayou.  One is from a storm

---

[67] Doc. 123-4, ¶ 29.
[68] Doc. 101-2, ¶ 40.
[69] Doc. 123-4, ¶ 30.
[70] *Id.*
[71] GRN objects to the consideration of this part of Mr. Cowart's declaration as, again, not based on personal knowledge.  *See* Fed. R. Civ. Pro. 56, Committee Notes on Rules – 2010 Amendment (discussed *supra*).

water outfall and surface flow down a channel almost under the 110.  The other is to the east of

that channel (the middle of the three places) and flows out into the wetland.  The eastern most is

down a watercourse that is directly adjacent to a power substation.  The eastern watercourse had

a sedimentation basin built there in 2017 or early 2018.

**Western drainage -**

Doc. 2431 from February 4, 2018 shows the western discharge area in which the sediment

fencing has been bypassed and water is flowing under it. Mr. Cowart testifies that the storm drain

outfalls in this area are not connected, although sediment flowing out of the pipes is evident. In

any case, this is not material since the movement of sediment offsite and ineffective controls is

the violation at issue. In addition, Mr. Cowart does not contest that the sediment runoff from the

disturbed area is bypassing the silt fence and moving off the construction site towards the bayou.

Mr. Cowart also does not contest that Doc. 2578 from February 11, 2018 shows the very heavy

sediment flows from the outfalls to the west under the 110, still running around and under the

sediment fence. Mr. Coward does not contest that Doc. 2728 shows that on March 6, 2018 storm

water and sediment are still flowing around and under the sediment fence in the western

drainage.

Thus, there is no dispute as to the material facts showing the violations in the Western

Drainage.

**Middle Drainage**

Mr. Cowart does not contest that Doc. 2563 from February 11, 2018 shows the middle channel

with no controls and water flowing into it from the construction area. Thus, there is no issue of

material fact.

**East Drainage**

21

This is the drainage with the check dam.  Mr. Cowart states that the check dam was installed for erosion control and states that "there is no violation visible in these images."[72]  However, he does not address the actual evidence of lack of controls on this drainage channel.  Docs. 2456, 2727, 2964, 2979 and 2985 all show that the bare dirt areas *below* the check dam do not have complete sediment fencing.[73]  Mr. Cowart does not address this evidence.

Docs. 2964, 3040 and 3043 all shows the check dam being bypassed with muddy water.  Ms. Englebretson further testifies that on July 16th and 17th she observed the check dam completely overrun with a river of sediment laden water.[74]  Docs. 2979 and 2985 from March 30 2018 show the sediment deposits below the sedimentation basin and the bare dirt.  Mr. Cowart does not contest that the check dam is being bypassed completely.

Oscar Renda argues in its memorandum that the check dam is an allowed erosion control measure, citing ACT 5, condition T-5 of the Storm Water Permit.  Plainly check dams can be used to "divert flows from exposed soils, store flows or otherwise limit runoff from exposed areas."  However, Oscar Renda does not dispute that the evidence shows the dam is being completely bypassed.  As Oscar Renda is well aware, Renee Robertson is also prepared to testify to the common sense fact that such controls cannot be bypassed.[75]

**Location 19 - Strangi and Sam Streets** – The evidence demonstrates that there was a dirt dam built directly in the bayou in this area.  The area adjacent to the dam lacks sediment fencing altogether on several dates.  The dam itself lacks any kind of storm water controls at all times.   Docs. 207, 1522, 1693, 1851, 1861, 1864, 2124, 2127, 2129, and 2158 all show the same

---

[72] Doc. 123-4, ¶ 32.
[73] Doc. 101-2, ¶ 41.
[74] *Id.*
[75] Doc. 119-1.

thing on different dates from February 7, 2017 through September 21, 2017.[76]  Mr. Cowart authenticates these photos and videos through his testimony, and states that this dam blew out on five separate occasions before it was replaced with a rock and fabric dam.[77]  He does not contest Ms. Englebretson's testimony that on multiple dates she observed large piles of dirt eroding directly in the bayou with no controls on them, and that the sediment washed in the bayou was obvious.[78]  He does not contest that she observed active erosion from underneath the sidewalk by Back Bay Boulevard with no controls in place.

There is no issue of material fact as to the violations in this location.

**Location 20 - Feeder stream to Auguste Bayou at Roy Street near Heidenheim Avenue** – The GRN's evidence showed that this water course lacked storm water controls, including the ones shown on the construction drawings, and that heavily silted water was flowing into it from the construction area on multiple occasions.[79]  Mr. Cowart does not contest any of this, or that controls were eventually installed.  Rather, he argues that this water course did not require any controls because it was "heavily vegetated" and goes on for hundreds of feet before reaching any area that is a water of the United States.[80]  However, the SWPPP for this phase, GRN 5, does not except areas flowing to watercourses with vegetation from the need for perimeter storm water controls.  The Storm Water Permit provides that "[s]torm water discharges that enter waters of the State or storm water conveyance systems that leading to waters of the State are subject to regulation and compliance with the conditions set forth in this permit."[81]  "Waters of the State" are defined broadly to include, in pertinent part, "all waters within the

---

[76] Doc. 101-2, ¶ 42.
[77] Doc. 123-4, ¶ 33.
[78] The GRN notes that the deposits from the multiple dam washouts are the same ones that Dr. Kevin Dillon identified as not natural deposits, and that Dr. James Connors asserted were natural deposits.
[79] Doc. 101-2, ¶ 20.
[80] Doc. 123-4, ¶ 34.
[81] Doc. 101-5 p. 59.

jurisdiction of this state, including all streams . . . watercourses, waterways, drainage systems and all other bodies or accumulations of water, surface and underground, natural or artificial . . . except lakes, ponds or other surface waters which are wholly landlocked and privately owned, and which are not regulated under the Federal Clean Water Act . . . ."  The MDEQ included this as one of the outfalls of the project.[82] Again, there is no issue of material fact in this location.

**Location 21 - Bayview Avenue at Back Bay** – The GRN's evidence establishes and Mr. Cowart concedes that this is a large material yard where old Bayview Avenue meets Back Boulevard.  Mr. Cowart does not address Docs. 1425 and 1568 which establishes that there are large piles of dirt with no controls on May 17, 2017 and May 23, 2017.[83]  He states that Doc. 2522 "depicts silt fencing just outside a ring of dirt,"[84] but does not contest that the sediment fence is covered with dirt and sediment is running off the area towards the bay about 100 feet away.  He testifies that Doc. 2647 from February 11, 2018 shows that some maintenance has been done.[85]  However, he does not contest that the same sediment fence is still down and that there is sediment and runoff from the pile headed towards Back Bay.

Thus, in this location Oscar Renda does not actually contest the material facts demonstrating the violations.

**Location 22 - Parker Street at Bayview Avenue** – This location had a storm drain directly draining muddy water from the construction area to Back Bay.  There were rock bags around the drain, but they had a gap in them which allowed muddy water to flow directly into the drain.[86] Oscar Renda does not contest that the drain is connected and drains to Back Bay.  The company also does not address the fact there was a clear color inconsistency where the water is

---

[82] Doc. 123-2, p. 9.
[83] Doc. 101-2, ¶ 44.
[84] Doc. 123-4, ¶ 35.
[85] *Id.*
[86] Doc. 101-2, ¶ 45.

discharged into Back Bay.  Mr. Cowart does assert that there was black filter fabric on this drain.[87]  However, Doc. 2959 clearly shows that the water is flowing directly down the drain, not backing up as it would with filter fabric.

The material facts in this location clearly show that the storm water controls were inadequate and not properly maintained, and that narrative water quality standard violations occurred.

**Location 23 - Bayview Avenue adjacent to Gulf Pride Seafood Enterprises** – The evidence establishes, and Oscar Renda does not contest that this area is a large materials yard about 300 feet east of the un-named bayou.  It borders the wetlands area that fringes the bayou.[88]  Mr. Cowart concedes that Doc. 2723 on March 6, 2018 shows uncontrolled storm water coming across the road from the dirt stockpile and entering Biloxi Bay.  He states that controls were installed after this was brought to the company's attention by the GRN.  Mr. Cowart also concedes that the images show pumping without controls and that this is improper.[89]  Oscar Renda states that the images from June 15 2018 reflect activities of Gulf Pride Seafood in an area adjacent an Oscar Renda material yard.  The GRN agrees that if that is the case the deficiencies shown are not properly part of this case, and withdraws this video.

## II.    CONCLUSION

For the reasons set out above and in the preceding pleadings, there is no issue of material fact, and the Gulf Restoration Network is entitled to partial summary judgment as set forth in its motion, with the exception of the single date at Location 23 noted above.

---

[87] Doc. 123-4, ¶ 36.
[88] Doc. 101-2, ¶ 46.
[89] Doc. 123-4, ¶ 37.

Dated this 17th day of September, 2018.

Respectfully submitted,

WALTZER WIYGUL & GARSIDE LLC

*/s/ Robert B. Wiygul*
Robert B. Wiygul, MS Bar #7348
1011 Iberville Dr.
Ocean Springs, MS 39564
Tel: (228) 872-1125
Fax: (228) 872-1128
robert@wwglaw.com

*/s/ Elizabeth A. Fisher*
Elizabeth A. Fisher, MS Bar #105458
Attorney at Law
6901 Shore Drive
Ocean Springs, MS 39564
Tel: (919) 909-9980
efisher.attorney@gmail.com

## CERTIFICATE OF SERVICE

I, Robert B. Wiygul, certify that I have served a copy of this pleading to all counsel through their registered ECF email address this 17th day of September, as follows:

Todd Crawford:  TCrawford@frfirm.com

*/s/ Robert B. Wiygul*